# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ALASKA

In re:

JOHN F. HANRATH and MARGARET A. HANRATH,

               Debtors.

Case No. A09-00340-DMD

Chapter 7

**Filed On 12/2/09**

## MEMORANDUM ON TRUSTEEE'S OBJECTION TO EXEMPTIONS

The trustee has filed an objection to the debtors' amended claim of exemptions. For the reasons stated below, the objection will be sustained.

<u>Case Background</u>

The debtors filed their chapter 7 petition on May 27, 2009. After their initial § 341 meeting, which was fairly contentious, they filed amended schedules and an amended statement of financial affairs. The trustee filed a timely objection to the debtors' amended exemptions on September 30, 2009.

When the debtors filed their joint petition, they were in the process of separating, although they had not yet filed for divorce. The Hanraths first consulted bankruptcy counsel in January or February of 2009. John Hanrath subsequently moved into an apartment, while Margaret remained in the family home. At their first § 341 meeting, held on June 23, 2009, the Hanraths said they had filed bankruptcy because they were

overextended due to medical treatments John had needed for a serious illness. They also had substantial credit card debt. Their lives had become chaotic and stressful.

The Hanraths testified that they had reviewed their original schedules and statements just before filing their petition. However, during the course of the § 341 meeting, the accuracy of those documents came into question. First, Margaret was questioned extensively by the trustee with regard to a parcel of Homer real property which she had transferred to her daughter in March, 2009. The parcel was not listed on the debtors' Schedule A, but its conveyance was disclosed on their Statement of Financial Affairs.[1] This parcel initially belonged to Margaret's mother. Margaret told the trustee that the property had been deeded to her about a year or so earlier as part of her mother's estate planning. Margaret said she never considered the Homer parcel as hers. She believed she was just holding the parcel for her mother, who had continued to live on it after the transfer. Margaret conveyed the Homer property to her daughter at her mother's request. The conveyance was made, however, after Margaret told her mother that she was contemplating filing bankruptcy. Two adversary proceedings have been filed pertaining to the Homer property, one by the trustee against Margaret's daughter, alleging fraudulent conveyance,[2] and the other by

---

[1] Statement of Fin. Affairs, filed May 27, 2009 (Docket No. 1), at ¶ 10.

[2] *Barstow v. Lewis*, Adv. No. A09-90024-DMD.

2

Margaret's mother, seeking a determination that the bankruptcy estate has no interest in the parcel.[3]

Other items on the debtors' schedules and statements also caused concern to the trustee. Their Statement of Financial Affairs showed that Margaret had received sizeable dividends from the Arctic Slope Regional Corporation in 2007 and 2008.[4] The dividends were $3,337.35 and $4,154.80, respectively. Her interest in the corporation wasn't listed on Schedule B, however.

The debtors' Schedule I indicated that Margaret was repaying a loan taken from her Thrift Savings Plan ("TSP"). When questioned about this loan at the § 341 meeting, Margaret testified that the loan was for $24,000.00. She said she borrowed this sum from her TSP in February, 2009, so she could pay for some needed home maintenance which had been deferred during John's illness. Margaret testified that she had spent $22,000.00 from the TSP loan, but couldn't give specifics as to what she spent the money on.

Margaret's testimony was inconsistent with information shown on bank statements which the debtors had brought to the § 341 meeting. The trustee noted that a bank statement for March, 2009, showed a TSP deposit of $31,950.00, rather than $24.000.00. Margaret couldn't explain why the bank statement showed this larger sum. Further, the bank statement showed a withdrawal of $24,000.00 on March 30, 2009. The trustee repeatedly

---

[3] *Yenney v. Barstow*, Adv. No. A09-90028-DMD.

[4] Statement of Fin. Affairs (Docket No. 1), at ¶ 2.

asked Margaret what she did with this money. Margaret's responses were evasive. She said she couldn't remember how she had spent the money and would have to check her records. John stated that he had already moved out of the home and didn't know anything about this sizeable withdrawal.

The § 341 meeting was concluded as to John but continued as to Margaret. The trustee asked Margaret for documentation regarding the Homer real property and the TSP loan. The Assistant United States Trustee asked the debtors to file amended schedules and statements. The debtors were to include their PFD income on Schedule I and provide information regarding John's separate living expenses on Schedule J.

After the § 341 meeting had concluded, the trustee obtained copies of the debtors' bank records. The records established that Margaret had requested a TSP loan for $32,000.00 on March 17, 2008. John had also signed the loan application. TSP funds of $31,950.00 were deposited into a recently established bank account in Margaret's name only. The $24,000.00 withdrawal from Margaret's account on March 30, 2009, was for a cashiers check payable to her brother, William Strutz. Strutz subsequently transferred $23,320.00 back to Margaret in two payments, one for $12,000.00, deposited in Margaret's account on April 18, 2009, and the other for $11,320.00, deposited on May 16, 2009. The same day that the second deposit was made, Margaret withdrew $8,000.00 in cash from her account.

Additional, substantial transactions occurred. On March 25, 2009, Margaret paid APX Alarm $2,384.47 on a past due debt. She purchased an $823.50 season ticket to

4

the Anchorage Aces games on March 26, 2009.  Margaret purchased a $4,250.00 support bed from Nerland's Sleep Comfort on April 20, 2009, and $621.34 in merchandise from Bed, Bath & Beyond on April 26, 2009.  She also wrote a check to her husband John for $1,911.00 on April 22, 2009.  The funds were used to purchase a couch and to pay the debtors' bankruptcy counsel $1,300.00.  Margaret withdrew $2,000.00 cash from her account on May 2, 2009.  She lent this money to her brother so he could purchase a trailer.  The loan was repaid post-petition.  Margaret wrote a check for $1,805 for her mortgage payment on May 5, 2009, and purchased a $782.00 Alaska Airlines ticket on May 22, 2009, for post-petition travel to Arizona.  Two days after the petition was filed, Margaret deposited a paycheck for $1,912.14 in the account.

On August 14, 2009, the debtors filed amended schedules and an amended statement of financial affairs.  Amended Schedule B revealed several assets which were either not disclosed or undervalued on the original schedules.  The changes are summarized as follows:

| Type of Property | Description/Location | H, W, or Joint | Value (per Amended Schedule B) | Value (per Original Sched. B. |
|---|---|---|---|---|
| 1. Cash on hand | wallet/purse: at wife's home in drawer | J | $5,675.00 | $75.00 |
| 4. Household Goods and Furnishings | support bed (medical) | W | $2,500.00 | not listed |
| | 41" Panasonic TV (2007) | W | $600.00 | not listed |
| | couch | H | $600.00 | not listed |
| 5. Books, pictures, other art objects | Oosik, ivory, baleen, misc. carved and uncarved pieces from family | J | $1,500 | not listed |

5

| | | | | |
|---|---|---|---|---|
| 8. Firearms and sports, other hobby equipment | Nearly new MacGregor golf clubs (full set) | H | $100.00 | not listed |
| 9. Interest in insurance policies | Husband's Royal Neighbors life insurance policy | H | $1,000.00 | not listed |
| | Husband's Prudential life insurance whole life policy $8,000 death benefit | J | $4,967.00 | not listed |
| | Life Insurance policy at work (Post Office) term policy; estimated face value $250,000; no cash value | W | $1.00 | not listed |
| 12. Interests in IRA, ERISA, Keogh, or other pension or profit sharing plan | Wife: Thrift Savings Plan | W | $52,000.00 | $24,000.00 |
| 13. Stock and interests in incorporated and unincorporated businesses | 100 shares Arctic Slope Regional Corp., non-transferrable | W | $1.00 | not listed |
| 15. Government and corporate bonds and other negotiable and non-negotiable interests | Unmatured Series E govt. savings bonds (approx 20), face value $100; purchased for $50 each through payroll deduction | W | $1,000.00 | not listed |
| 21. Other contingent and unliquidated claims of every nature | Savings Bonds (17 at $100 face value; not mature) | J | $850.00 | $200.00 (for 12) |
| 25. Automobiles, trucks, trailers, and other vehicles | 2000 F-150 Ford truck, no title, very poor condition | J | $1.00 | not listed |
| 35. Other personal property of any kind not already listed. | Flex savings plan at work to cover insurance deductibles, medications in excess of insurance | W | $3,000.00 | not listed |
| | Aces season tickets (2) for 2009-10 | J | $1,800.00 | not listed |
| | Insurance claim for glasses lost ($500); prescriptions, doctors; visits ($300) | J | $800.00 | not listed |

On both their original and amended Schedule C, the debtors applied the federal bankruptcy exemptions found in 11 U.S.C. § 522(d). All of the assets which had been added

6

or revalued on the debtors' amended Schedule B were claimed exempt on their amended Schedule C, with the exception of three: Margaret's life insurance policy from work, her 100 shares of Arctic Slope Regional Corp. stock, and the F-150 truck in poor condition. These three assets had each been given a scheduled value of $1.00.

In the trustee's objection to the debtors' amended exemptions, he notes that the debtors still have not accounted for the $2,000.00 loan to Margaret's brother, the $782.00 Alaska Airlines ticket, or Margaret's accrued wages of $1,912.14. The trustee argues that bad faith can be inferred from the inaccuracies and omissions on the debtors' schedules. He also contends Margaret's pre-petition transfer of the Homer property to her daughter is inescapable evidence of bad faith. He argues that the amended exemptions should be denied.

As an alternative to disallowance of the amended exemptions, the trustee argues that the debtors should not be permitted to "stack," or combine their wildcard exemptions to protect Margaret's separate assets. He also objects to the exemption of the support bed and the 61" television set as household goods under § 522(d)(3) because both assets exceed the $525.00 value limitation. He further argues that the debtors can exempt only one television set under subsection (d)(3). Four television sets are listed as household goods. Finally, the trustee contends Margaret cannot exempt her Flex Savings Plan under § 522(d)(10). At a minimum, the trustee says Margaret should be required to turn over $13,085.29, representing non-exempt equity in her personal property.

7

The debtors say the errors and omissions in their schedules do not rise to the level of bad faith or prejudice found in other cases to justify denial of amended exemptions. While conceding that Margaret should have disclosed the $5,000 in cash she had in her purse when the petition was filed, the debtors note that both the transfer of the Homer property and the TSP loan were disclosed in their original schedules and statements. They also point out that the additional items included on their amended Schedule C do not cause them to exceed any of the aggregate value limitations found in § 522(d). They point out that wholesale denial of the amended exemptions would injure John, who can no longer work full time and was not aware of Margaret's prepetition transactions, as much or more than Margaret. They note that the trustee has provided no authority for his stacking argument, and argue that their combined (d)(5) exemptions should be applicable to all of their assets. It is also noted that Margaret suffers from anxiety and depression. The argument is made that the medical bed could be fully exempted as a prescribed health aid under § 522(d)(9). They conclude that the amended exemptions should be allowed in their entirety.

Analysis

> A fundamental component of an individual debtor's fresh start in bankruptcy is the debtor's ability to set aside certain property as exempt from the claims of creditors. Exemption of property, together with the discharge of claims, lets the debtor maintain an appropriate standard of

8

> living as he or she goes forward after the bankruptcy case.[5]

Fed. R. Bankr. P. 1009(a) permits a debtor to amend his petition or schedules "as a matter of course at any time before the case is closed."[6] This rule is liberally construed and, absent a showing of bad faith or prejudice to third parties, amended exemptions should be allowed.[7] Prejudice may be found where an amended exemption causes third parties to suffer actual economic loss or disappoints creditors' expectations.[8] Delay in amending schedules, by itself, is not indicative of either bad faith or prejudice.[9]

Many courts have held that bad faith or prejudice, in the context of considering amended exemptions, must be established by clear and convincing evidence.[10] However, the applicable burden of proof may have been affected by the Supreme Court's decision in *Grogan v. Garner*,[11] in which the Court held that a "preponderance of evidence" standard applied in a nondischargeability action brought under 11 U.S.C. § 523(a)(2) for fraud.[12]

---

[5] 4 *Collier on Bankruptcy* ¶ 522.01 at 522-15 (15th ed. revised 2009).

[6] Fed. R. Bankr. P. 1009(a).

[7] *Martinson v. Michael (In re Michael)*, 163 F.3d 526, 529 (9th Cir. 1998); *see also Arnold v. Gill (In re Arnold)*, 252 B.R. 778, 784 (B.A.P. 9th Cir. 2000) (bad faith, prejudice, or exceptional circumstances may prevent a debtor from amending his schedules).

[8] *Arnold*, 252 B.R. at 787.

[9] *Id.* at 786-787.

[10] *Michael*, 163 F.3d at 529; *Arnold*, 252 B.R. at 784 n.10 (citing cases).

[11] 498 U.S. 279 (1991).

[12] *Arnold*, 252 B.R. at 785 n.10.

9

Given the facts present here, I feel the trustee has established bad faith on Margaret's part under either standard.

The trustee bases his bad faith argument on two grounds: the inaccuracies and omissions on the debtors' schedules and statements, and Margaret's pre-petition transfer of the Homer property to her daughter. The transfer of the Homer property was disclosed on the debtor's original statement of financial affairs, as were Margaret's dividends from the Arctic Slope Regional Corporation. If this case rested simply on these two items, there would be no basis for finding bad faith when considering the debtor's amended exemptions.[13] However, the inaccuracies and omissions on the Hanraths' schedules were much more substantial and, considered as a whole, cannot be attributed to simple oversight.

In the context of amended exemptions, bad faith is determined by the totality of the circumstances.[14] "The usual ground for a finding of 'bad faith' is the debtor's attempt to hide assets."[15] Here, looking at the totality of the circumstances, the court is left with the inescapable conclusion that Margaret has attempted to conceal assets. Even considering the stress in the debtors' lives at the time they filed their petition, Margaret's professed inability to recall the $24,000.00 transfer to her brother is unbelievable. The same can be said for her failure to account for the $5,600.00 cash in her wallet at the time the petition was filed. And

---

[13] *Arnold*, 252 B.R. at 786.

[14] *In re Rolland*, 317 B.R. 402, 414-15 (Bankr. C.D.Cal. 2004)(citing cases).

[15] *Id.* at 785.

there were other relatively valuable assets that were not disclosed initially: the medical bed, which was purchased for $4,000.00 but given a scheduled value of $2,500.00, a new couch and a television, each with a scheduled value of $600.00, $1,650.00 worth of additional savings bonds, the Aces season ticket, three life insurance policies, insurance claims worth $800.00 and $3,000.00 in a Flex savings plan.[16]  Further, in spite of the amendments to the schedules, Margaret's disclosures are still incomplete.  She did not schedule the $2,000.00 loan to her brother, the Alaska Airlines ticket, or her accrued wages.

Several courts have found that multiple inaccuracies or falsehoods on a debtor's schedules "rise to the level of reckless indifference to the truth, which is the functional equivalent of intent to deceive."[17]  I find that the inaccuracies and omissions found here were made with a reckless indifference to the truth or with an actual intent to conceal assets.  Bad faith has been established.  Additionally, I find that the failure to fully and accurately disclose these assets is primarily attributable to Margaret.  John had moved into an apartment and didn't know about the transactions in Margaret's bank account.  Although Margaret testified at the § 341 meeting that she had never had her own bank account before, her sizeable prepetition financial transactions cannot be chalked up to a lack of financial

---

[16] The court also notes that the value of Margaret's Thrift Savings Plan ("TSP") more than doubled on amended Schedule B, from $24,000.00 to $54,000.00.  There is nothing in the record to explain this increased value.  If Margaret deposited funds back into her TSP to repay the prepetition loan she took from this plan (which would seem like the logical explanation for the increase in value), then the $574.38 deduction from her monthly income shown on amended Schedule I, representing the repayment of that loan, would no longer be required and her net monthly income would increase commensurately.

[17] *Rolland*, 317 B.R. at 415-16 (citing cases).

11

sophistication. Nor can the omissions and inaccuracies on the schedules be attributed to a lack of sophistication. Instead, they can be attributed to a reckless indifference to the truth or an actual intent to conceal assets.

I conclude that the debtors' amended exemptions should be disallowed in their entirety on the ground of bad faith. It is unnecessary for me to reach the trustee's alternative arguments for their disallowance (stacking of exemptions and value limitations). The debtors are directed to turn over to the trustee the cash equivalent of the non-exempt assets, including those which have not yet been scheduled (e.g., the $2,000.00 loan, the airline ticket, and the accrued wages). Due to inconsistencies which currently exist in the record, the court cannot determine the exact value of the non-exempt assets.[18] If the parties cannot agree on this point, the court will require supplemental pleadings before it can make this determination.

An order will be entered consistent with this memorandum

DATED:   December 2, 2009

BY THE COURT

/s/ Donald MacDonald IV
DONALD MacDONALD IV
United States Bankruptcy Judge

Serve:  F. Cahill, Esq.
        G. Spraker, Esq.
        W. Barstow, Trustee
        U. S. Trustee

    12/02/09

---

[18] At the hearing on this matter, it appeared there was some dispute regarding the actual value of the Aces tickets. Further, there appears to be some discrepancy as to the number of bonds the debtors have.